Comput. Design & Integration, LLC v. Brown, 2017 NCBC 8.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 11847

COMPUTER DESIGN &
INTEGRATION, LLC and
COMPUTER DESIGN &
INTEGRATION SOUTHEAST, LLC,

       Plaintiffs,

v.

DAVID A. BROWN, MARCUS
JACOBY, and ROVE, LLC,

       Defendants,

DAVID A. BROWN and MARCUS
JACOBY,

       Third-Party Plaintiffs,

v.

ERIC BAKKER and BRIAN T. REID,
CPA,

       Third-Party Defendants.

**ORDER AND OPINION ON PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

1.    **THIS MATTER** is before the Court upon Plaintiffs Computer Design & Integration, LLC ("CDI") and Computer Design & Integration Southeast, LLC's ("CDISE") (collectively, "Plaintiffs") Motion for Preliminary Injunction ("Motion") pursuant to Rule 65 of the North Carolina Rules of Civil Procedure ("Rule(s)") in the above-captioned case.

2.    Having considered the Motion, the briefs, exhibits, and affidavits in support of and in opposition to the Motion, and the arguments of counsel at the hearing on the Motion on December 13, 2016, the Court **GRANTS in part** and **DENIES in part** the Motion as set forth herein.

*Bell, Davis & Pitt, P.A., by Edward B. Davis and Joshua B. Durham, for Plaintiffs Computer Design & Integration, LLC and Computer Design & Integration Southeast, LLC and Third-Party Defendants Eric Bakker and Brian T. Reid.*

*Alexander Ricks, PLLC, by Mary K. Mandeville and Alice C. Richey, for Defendants David A. Brown, Marcus Jacoby, and Rove, LLC and Third-Party Plaintiffs David A. Brown and Marcus Jacoby.*

Bledsoe, Judge.

## I.

## PROCEDURAL HISTORY

3. CDI and CDISE filed their Verified Complaint on June 30, 2016, asserting claims against David A. Brown ("Brown"), Marcus Jacoby ("Jacoby"), and Rove, LLC ("Rove") (collectively, "Defendants") arising out of failed negotiations for Brown's purchase of CDISE and Defendants' alleged wrongful conduct in its competition with CDISE. Plaintiffs assert claims against (i) Brown for breach of contract, failure to negotiate in good faith, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty, (ii) Jacoby for breach of contract, and (iii) all Defendants for misappropriation of trade secrets, conversion, tortious interference with contract, tortious interference with prospective economic relations, unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1, and for injunctive relief under Rule 65.

4. Plaintiffs filed the Motion on October 24, 2016, seeking a preliminary injunction enjoining Defendants from using, disclosing, or distributing any of CDISE's confidential or trade secret information; retaining, using, disclosing, or distributing any of CDISE's property; representing to any person or entity that Rove is a

successor-in interest to, continuation of, or the same entity as CDISE; and soliciting or performing any services for up to 123 specifically identified, current customers of Plaintiffs.

5. The Motion has been fully briefed, and the Court held a hearing on the Motion on December 13, 2016, at which all parties were represented by counsel.

6. Plaintiffs and Defendants advised the Court at the hearing that the parties had scheduled a mediation for January 13, 2017 and that, in their collective view, settlement would be facilitated if the Court did not resolve the Motion until after the parties had completed mediation. The Court therefore indicated at the hearing that it would not rule on the Motion pending the completion of the mediation and ordered the parties to provide a status report concerning their settlement efforts no later than January 17, 2017.

7. Also at the hearing, Plaintiffs indicated that they wished to reduce the number of Plaintiffs' customers they contend should be the subject of the proposed injunction. The Court ordered Plaintiffs to submit an alternative list ("Alternative Customer List") with a supporting statement no later than December 16, 2016 and directed Defendants to file any response no later than December 22, 2016. Plaintiffs thereafter timely submitted the Alternative Customer List and supporting statement and Defendants timely filed their opposition.

8. On January 17, 2017, the parties informed the Court that settlement efforts had reached an impasse. Therefore, the Motion is now ripe for resolution.

## II.

## FINDINGS OF FACT

9. Having considered the affidavits, briefs, arguments, and supporting materials presented to the Court, the Court makes the following FINDINGS OF FACT for the limited purpose of resolving the Motion[1]:

10. CDI is a New York limited liability company formed in 1995, with its principal place of business in Bergen County, New Jersey. (Compl.[2] ¶ 1.)

11. CDISE is a North Carolina limited liability company formed in 2010, with its principal place of business in Mecklenburg County, North Carolina. (Compl. ¶ 2.)

12. Brown is a citizen and resident of Mecklenburg County, North Carolina. (Compl. ¶ 3.)

13. Jacoby is a citizen and resident of Rowan County, North Carolina. (Answer ¶ 4.)

14. Rove is a North Carolina limited liability company formed in 2015, with its principal place of business in Mecklenburg County, North Carolina. Brown is the managing member, and president, of Rove. (Answer ¶ 5.)

15. CDI designs, deploys, and manages multiplatform hybrid IT solutions for businesses in a wide variety of industries and often partners with technology companies in order to address the needs of CDI's customers. (Compl. ¶ 6.) In

---

[1] This Court is not bound at a trial on the merits by the findings of fact made in a preliminary injunction order. *Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005) (citing *Huggins v. Wake County Board of Education*, 272 N.C. 33, 40–41, 157 S.E.2d 703, 708 (1967)).

[2] The Complaint in this action was verified under oath by Erik Bakker, CDI's President, on June 30, 2016.

particular, CDI is a "Value Added Reseller," or VAR. (Ryan Aff. ¶ 3.) VARs resell hardware from technology manufacturers, but include additional services with the sale, such as design, installation, and maintenance. (Ryan Aff. ¶ 4).

16. Brown was working for a business partner of CDI when CDI and Brown discussed an expansion of CDI into the Southeastern United States. (Compl. ¶¶ 8–9.) Brown decided to resign from his current position to assist with the expansion. (Compl. ¶ 9.)

17. In 2010, CDI and Brown organized CDISE to take advantage of the market possibilities they had identified in the Southeastern United States. (Compl. ¶ 10.) CDI and Brown entered into a written operating agreement for CDISE, dated November 5, 2010 ("Operating Agreement"). (Compl. ¶ 10.) The Operating Agreement provided that Brown and CDI each held a fifty-percent membership interest in CDISE. The Operating Agreement further provided that Brown would serve as President and handle the day-to-day management of CDISE, and that CDI would be the managing member of CDISE with "full, complete and exclusive authority, power and discretion to direct, manage and control the business, affairs and assets of [CDISE], to exercise any of the powers of [CDISE], to make all decisions regarding those matters, and to perform any and all other acts or activities it deems necessary, appropriate, proper, advisable or convenient with respect thereto." (Compl. ¶ 10.)

18. Significantly for this case and this Motion, the Operating Agreement also contains a non-disclosure provision, which states as follows:

> Each Member hereby covenants and agrees to maintain the confidentiality of, and not disclose, the terms of this Agreement, any document or information received from [CDISE] or another Member in connection herewith or in connection with the operations or finances of [CDISE] or any proprietary or confidential information, technical data, trade secrets, know-how generated or collected by or utilized in the operation of [CDISE], and shall not publish or otherwise disclose the same at any time without the prior written consent of all Members. Without such prior written consent, such disclosure shall be permitted only to the extent required (i) by applicable law or regulation, (ii) court order, (iii) to carry out the business of [CDISE] and (iv) to obtain advice from accountants, tax advisors and legal counsel of a Member or [CDISE].

(Compl. ¶ 40; Answer, Ex. A § 13.1.) (the "Confidentiality Provision"). The information and materials described in the first sentence of the Confidentiality Provision that the Member agrees not to disclose shall hereafter be referenced as the "Protected Information."

19. Neither Brown nor Jacoby is subject to a covenant not to compete or a non-solicitation agreement with CDI or CDISE. (Brown Aff. ¶ 80; Jacoby Aff. ¶ 21.)

20. CDISE hired Jacoby in February 2011, as a senior account manager, and, after several promotions, Jacoby ultimately became CDISE's vice-president. (Compl. ¶¶ 11–12.)

21. The industry in which CDISE is engaged is an extremely competitive one, and repeat customers are a critical source of business for those in the industry. (Bakker Aff. ¶ 9.) Numerous VARs frequently compete for the same opportunities. (Ryan Aff. ¶ 5.) In 2015, at the behest of one of CDISE's customers, some CDISE employees were required to sign confidentiality agreements as a condition of employment at CDISE and as a condition of working for that specific customer. (Bakker Aff. ¶ 9; Brown Aff. ¶ 93.) Jacoby was one of those employees. He signed

CDISE's new standard confidentiality agreement on October 27, 2015 (the "Confidentiality Agreement"). (Bakker Aff. 24–25.) Jacoby did not receive anything of value from CDISE when he signed the Confidentiality Agreement other than continued at-will employment with CDISE. (Jacoby Aff. ¶ 45.)

22. The Confidentiality Agreement provides, in relevant part, that Jacoby "will protect and refrain from disclosing all confidential information, while engaged by [CDISE] and after [Jacoby] has completed all services and obligations for [CDISE]." The Confidentiality Agreement defines "confidential information" to include "customer information, pricing data, supply sources, techniques, computerized data, maps, methods, product design information, market information, technical information, [CDISE] standards and other confidential and/or proprietary information belonging to or licensed to, [CDISE] or its clients or customers, including but not limited to, trade secrets, inventions, patents, and copyrighted materials." Jacoby confirmed in the Confidentiality Agreement that "all confidential information remains the property of [CDISE]." The confidential information protected by the Confidentiality Agreement will hereafter be referenced as the "Confidential Information."

23. It appears to the Court based on the evidence of record on this Motion that the "confidential information" described in the nondisclosure provision of the Operating Agreement constitutes the same "confidential information" described in the Confidentiality Agreement. Thus, the Court finds and concludes that CDISE's Confidential Information (as defined herein) is included with and deemed a part of CDISE's Protected Information (as defined herein).

24.     CDISE's 2015 employee handbook emphasized the need for confidentiality. (Bakker Aff. ¶ 9, 26–27.)  Employees were given password-protected laptops. (Bakker Aff. ¶ 9.)   CDISE also maintained many sensitive business records in locked file drawers. (Compl. ¶ 32).

25.     CDISE marks its pricing proposals and scope of work documents with confidential designations. (Durham Aff. 103.)  This was done to discourage potential customers from sharing information with other integrators competing for the same project, but customers routinely shared CDISE's pricing proposals and scope of work documents with other integrators bidding on the same project and openly discussed the work with other integrators after a project was awarded.  (Brown. Aff. ¶ 94.) Additionally, when pricing proposals or quotes involved the leasing of equipment, the specific equipment involved was typically identified in publicly available UCC filings. (Brown. Aff. ¶ 94.)  Vendors also attended customer meetings where pricing proposals and quotes were discussed. (Brown Aff. ¶ 96.)

26.     In 2015, Brown approached CDI about possibly purchasing CDI's membership interest in CDISE, and ultimately, on December 8, 2015, Brown and CDI agreed to terms concerning Brown's purchase of CDISE's assets.  (Compl. ¶ 13.) However, deadlines for closing the transaction passed several times without consummation of the transaction. (Compl. ¶¶ 15–18.)

27.     From the time of the first term sheet in early 2015, Brown agreed that he and CDISE would conduct "business as usual." (Bakker Aff. 49.)  During the ensuing months, Brown undertook many efforts to ready Rove for its eventual launch after Brown's purchase of CDISE's assets. (Brown Aff. ¶ 47.)

28. The economic forecast for CDISE's future business was positive. On May 4, 2016, Jacoby forecast that CDISE's sales pipeline was $64 million for the remainder of 2016. (Bakker Aff. 119–45.) Opportunities included Medic, Octapharma Plasma, Park Sterling Bank, South State Bank, Springs Global, Sunbelt Rentals, TIAA, and TradeKing, among many others. (Bakker Aff. 119–45.) Brown and Jacoby used this forecast in an attempt to obtain funding for Rove. (Jacoby Aff. ¶ 25.)

29. In early 2016, Brown hired Brian Calfo ("Calfo") to be in charge of operations and quotes for Rove. (Bakker Aff. ¶ 8; Brown. Aff. ¶ 52.) In performing his services, Calfo used a gorove.com (later changed to withrove.com) email address. (Bakker Aff. 81; Durham Aff. 124.)

30. On or about May 2, 2016, Brown hired Chelsea Cancelliere ("Cancelliere") as an inside sales representative for Rove. (Bakker Aff. ¶ 8; Brown Aff. ¶ 52.)

31. Neither Calfo nor Cancelliere signed a confidentiality agreement protecting CDISE's confidential and proprietary information. (Bakker Aff. ¶ 8.) Both Cancelliere and Calfo had access to CDISE's sales system. (Bakker Aff. 57.) Cancelliere worked in CDISE's office. (Answer ¶ 22.)

32. During the first half of 2016, Brown and others employed by or associated with Rove communicated with customers about the anticipated acquisition of CDISE's assets. (Answer ¶ 23.)

33. In May 2016, Brown or someone acting at his direction prepared Rove's Capabilities Statement, which stated that Rove was "formerly CDI Southeast." (Answer ¶ 23.) Rove employees and individuals associated with Rove provided the Capabilities Statement to potential Rove customers despite the fact that the asset

acquisition did not occur and Rove never was or became "CDI Southeast." (Answer ¶ 23; Durham Aff. 34–36; Bakker Aff. 89–91.)

34. On May 18, 2016, Chris Horn falsely informed CDISE's potential customer, TIAA, that Rove had already completed the buyout of CDISE's assets. (Durham Aff. 34.) Horn also sent a Capabilities Statement falsely representing that Rove was a mere continuation of CDISE. (Durham Aff. 36.)

35. On May 25, 2016, Josh Monza told CDISE's potential customer, TIAA, that a number of CDISE employees had switched their email accounts to the withrove.com address. (Durham Aff. 17.) TIAA emailed Chris Horn that same day at his withrove.com address and described the value of having a new business partner like CDISE. (Durham Aff. 14.)

36. On May 31, 2016, Josh Monza falsely told CISCO, a potential CDISE customer, that the buyout had occurred. (Bakker Aff. 89.) He also sent the same inaccurate Capabilities Statement to CISCO representing that Rove was "formerly CDI Southeast." (Bakker Aff. 89–91.)

37. On June 2, 2016, Patrick Gloriod of CSI Leasing, Inc. sent an email to CDISE's potential customer, TIAA, with a copy to Brown, stating that "Rove is formerly CDI Southeast" and is "the best technology integrator in the Southeast . . . ." (Hendershott Aff., Ex. P.) There is no indication in the record that Brown ever corrected the misrepresentation to TIAA that "Rove [was] formerly CDI Southeast."

38. Also on June 2, 2016, a potential CDISE customer, Ally, advised that it wished to engage CDISE's services. (Durham Aff. 77–78.) Chris Horn informed Defendants Brown and Jacoby that the transaction with Ally represented a "[n]ice

services gig we can hold over till July." (Bakker Aff. 77.) Monza asked everyone to confirm that "we all agree to go Rove correct?" (Bakker Aff. 79.)

39. In June 2016, Rove employees and agents obtained certain of CDISE's pricing proposals and quotes for existing and potential CDISE customers, all of which were marked with confidentiality designations, and sent such proposals and quotes to customers using their withrove.com or gorove.com e-mail addresses. (Answer ¶ 26; Durham Aff. 77–101 (Ally Statement of Work), 102–123 (AgFirst quote), 124–43 (Spring Global quotes), 144–48 (Park Sterling Bank quote), 149–155 (Compass Group), 156–172 (Octopharma Plasma quote), 189–202 (Sunbelt quotes), 203–241 (Medic quote), 242–48 (TradeKing quotes).)

40. On June 7, 2016, an email between Chris Horn and Jack Daykin indicated that the documentation relating to Octapharma Plasma was located in a withrove.box.com cloud storage service. (Bakker Aff. 69.) Horn also sent CDISE's Statement of Work template to his withrove.com account. (Durham Aff. 173–88.)

41. On June 10, 2016, Brown learned from Kian Capital that Kian Capital's preliminary due diligence would not support the deal terms to which he had agreed. (Brown Aff. ¶ 71.) That same day, CDISE's Matthew Floyd sent the entire team, including Brown, the "overall plan for the critical path" for Rove's launch, based on the assumption that Rove would own CDISE's assets on June 17, 2016. (Bakker Aff. 37.) There is no indication in the record that Brown ever instructed the team to delay preparations for the launch of Rove after it became apparent to Brown that the purchase of CDISE's assets would not occur.

42. On June 15, 2016, Brown informed DC74 that Rove was setting up its systems and planning to move into its newly-rented space during the following week. (Durham Aff. 65.) That same day, Brown revised a reseller agreement with EMC[2] to reflect that Rove would be operating at 3201 International Airport Drive. (Hendershott Aff. ¶ 9.)

43. On June 15, 2016 and June 16, 2016, Brown connected external memory devices to his CDISE-issued laptop and accessed various CDISE documents during those days. (Hendershott Aff. ¶¶ 6, 9.) He also reviewed certain CDISE employee records to determine which CDISE employees had covenants not to compete. (Brown Aff. ¶ 100b.)

44. Brown resigned as President of CDISE on June 16, 2016. (Brown Aff. ¶¶ 75–76.)

45. Over the following weekend, June 18 and 19, 2016, Brown recruited dozens of CDISE personnel to join Rove. (Bakker Aff. ¶ 16.) Twenty-four CDISE employees resigned on Sunday, June 19, 2016 to join Rove. (Bakker Aff. ¶ 16.) When Rove made these offers of employment, Rove required each employee to sign an employee restrictive covenant and confidentiality agreement to protect Rove's intellectual property and customer relationships. (Bakker Aff. 28–36.)

46. Four more CDISE employees resigned on Monday, June 20, 2016 to join Rove. (Bakker Aff. ¶ 16.)

47. CDI had previously indicated to Brown that in the event Brown's purchase of CDISE's assets did not occur, CDI, as CDISE's managing member, intended to either remove Brown as president of CDISE and continue to operate CDISE with

different leadership or to dissolve and liquidate CDISE. (Brown Aff. ¶ 74.) In recruiting CDISE's employees, however, Brown only informed them that CDI had advised that CDI intended to "remove [Brown] and liquidate CDISE." (Brown Aff. ¶ 82.)

48. On June 21, 2016, vendor EMC[2] informed Greenville Health System, a potential customer of CDISE, that "since CDI is now Rove, we need to have you request this quote on Rove paper now." (Bakker Aff. 86.) Jacoby was aware of this misrepresentation (Bakker Aff. 77), but there is no indication in the record that Jacoby corrected it.

49. Jacoby resigned on Wednesday, June 22, 2016. (Jacoby Aff. ¶ 19.)

50. Brown told Rove's new employees not to bring with them to Rove any materials, documents, or property belonging to CDISE. (Brown Aff. ¶ 83.)

51. Rove employees removed certain equipment belonging to CDISE from CDISE's office, including Horn's laptop, a CISCO server, certain Meraki advanced security gear, and computer drives that were to be included in the CISCO server. Rove returned such items only after demand by CDISE or its counsel. (Durham Aff. ¶ 6.)

52. Brown, Jacoby, Rove, and Rove's employees have been, and appear to remain, in possession of CDISE's Protected Information and have disclosed and used CDISE's Protected Information. (Durham Aff. 77–101, 203–41.)

53. Brown and Jacoby have solicited business from a limited number of customers who have also done business with CDISE. (Answer ¶ 33.)

54. In submitting a Statement of Work to Ally on July 12, 2016, Rove employee, Josh Monza, used an email chain that he had started while he was an employee at CDISE. The chain included an email sent by Monza at his CDISE email address "on behalf of" Monza at his withrove.com email address. (Durham Aff. 77.) The proposed Statement of Work, sent nearly one month after Brown's resignation, showed that Rove's office address was 1616 Camden Road. (Durham Aff. 79.) CDISE's address is 1616 Camden Road, not Rove's.

55. Plaintiffs have asked Defendants to return all CDISE materials which remain in Defendants' possession. While Defendants stated in July, 2016 that they had, to the best of their knowledge, returned all of CDISE's materials to CDISE, Defendants have continued to locate and return CDISE documents to Plaintiffs, including returning materials on December 8, 2016, less than one week before the hearing on Plaintiffs' Motion. The December 8, 2016 production contained documents that were uploaded from Rove's office to a box.com cloud storage account. (McCullough Aff.) Defendants discovered the upload on September 23, 2016. The various documents provided to Plaintiffs in expedited discovery, including the documents provided on December 8, 2016, include documents that relate to projects and proposals for customers and include CDISE's Protected Information.

56. There is no indication in the record that Defendants have corrected the misrepresentations that Defendants and their agents have made to Plaintiffs' existing and potential customers to the effect that "Rove is formerly CDI Southeast."

57. Rove is actively pursuing, and has pursued, many of the same opportunities and customers that its employees pursued while at CDISE prior to and at the time of Brown's resignation. (Ryan Aff., generally; Jacoby Aff., generally.)

58. Since Defendants initiated the activities described above, CDISE has lost valuable customer relationships and is projecting revenues for 2016 that are far less than its 2015 revenues and far less than those projected in Jacoby's May, 2016 forecast. (Bakker Aff. ¶ 21; Hendershott Aff., Ex. N; Ryan Aff., generally.)

III.

CONCLUSIONS OF LAW

59. BASED UPON the foregoing FINDINGS OF FACT, the Court makes the following CONCLUSIONS OF LAW:

60. "A preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759 (1983). A preliminary injunction is proper only:

> (1) if a plaintiff is able to show likelihood of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.

*Id.* at 401, 302 S.E.2d at 759–60 (citations omitted) (emphasis omitted). The burden is on the moving party to establish its right to a preliminary injunction, and the remedy "should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC LEXIS 39, at *17 (N.C. Super. Ct. Sept. 29, 2011) (citations omitted); *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E2d 478, 483 (1976).

61.     North Carolina courts have held that in assessing the preliminary injunction factors, the trial judge "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted.  In effect, the harm alleged by the plaintiff must satisfy a standard of relative substantiality as well as irreparability."  *Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

62.     Irreparable injury under Rule 65 is established upon a showing that "the injury is beyond the possibility of repair or possible compensation in damages" or "that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law."  *A.E.P.*, 308 N.C. at 407, 302 S.E.2d at 763 (citing *Barrier v. Troutman*, 231 N.C. 47, 50, 55 S.E.2d 923, 925 (1949)) (emphasis omitted).

63.     If there is a "full, complete and adequate remedy at law," the moving party is not entitled to the equitable remedy of injunction.  *Bd. of Light and Water Comm'rs v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 423, 271 S.E.2d 402, 404 (1980).  "[O]ne factor used in determining the adequacy of a remedy at law for money damages is the difficulty and uncertainty in determining the amount of damages to be awarded for defendant's breach."  *A.E.P.,* 308 N.C. at 406–07, 302 S.E.2d at 762.

64.     Based on the evidence of record, the Court concludes that there is a full, complete and adequate remedy of law as to each of Plaintiffs' claims except for (i) Brown's alleged breach of the Operating Agreement, (ii) Defendants' alleged

misappropriation of trade secrets, and (iii) Defendants' alleged unfair and deceptive trade practices. *See, e.g.*, *Whalehead Props. v. Coastland Corp.*, 299 N.C. 270, 283, 261 S.E.2d 899, 907–08 (1980) (discussing money damages as a legal remedy).

65. More specifically, the Court concludes that Plaintiffs' alleged damages for failure to negotiate in good faith, breach of the covenant of good faith and fair dealing, conversion, breach of fiduciary duty, tortious interference with contract, and tortious interference with prospective economic relations are not of such a "peculiar nature . . . that compensation in money cannot atone for it." *Frink v. N.C. Bd. of Transp.*, 27 N.C. App. 207, 209, 218 S.E.2d 713, 714 (1975) (citation omitted). As to these claims, therefore, the Court concludes that Plaintiffs have failed to show that they are likely to sustain irreparable loss unless an injunction is issued or that issuance of a preliminary injunction is necessary for the protection of Plaintiffs' rights during the course of the litigation. As a result, the Court denies Plaintiffs' Motion to the extent it is based on these claims.

A. Misappropriation of Trade Secrets

66. Under the North Carolina Trade Secrets Protection Act ("NCTSPA"), "actual or threatened misappropriation of a trade secret may be preliminarily enjoined during the pendency of the action and shall be permanently enjoined upon judgment finding misappropriation . . . ." N.C. Gen. Stat. § 66-154(a). Actual or threatened misappropriation may be established by the introduction of "substantial evidence" that a person against whom relief is sought "[k]nows or should have known of the trade secret; and [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent of the owner

[of the trade secret].” N.C. Gen. Stat. § 66-155. A defendant may rebut an owner's claim of misappropriation by proving that the defendant acquired the owner's trade secret information through independent development or reverse engineering, or by proving that the owner's "trade secret" information was received from another person with a right to disclose the information or is generally known in the industry. N.C. Gen. Stat. §§ 66-155, 66-152.

67.    A trade secret is defined under the NCTSPA as:

business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method technique, or process that

a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).

68.    In determining whether processes or information are trade secrets, the North Carolina courts generally consider six factors:

(1) the extent to which information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997) (citations omitted). The factors overlap, and courts considering these factors do not always examine them separately and individually.

*SCR-Tech LLC v. Evonik Energy Servs. LLC*, 2011 NCBC LEXIS 27, at *34 (N.C. Super. Ct. July 22, 2011).

69.    Furthermore, in a trade secret misappropriation case, "an applicant for a preliminary injunction must do more than merely allege that irreparable injury will occur. The applicant is required to set out with particularity facts supporting such statements so the court can decide for itself if irreparable injury will occur." *N.C. Farm P'ship v. Pig Improvement Co.*, 163 N.C. App. 318, 323, 593 S.E.2d 126, 130 (2004) (citations and quotations omitted).

70.    Plaintiffs contend that their alleged trade secrets consist of CDISE's "quotes, statements of work, the manner by which it prices out potential jobs and gathers information from its customers and potential customers; its organization chart; its financial information; its bonus programs; its offer letters and employment terms; and its contact lists." (Pls.' Mem. Supp. Mot. Preliminary Inj. 19.)

71.    Based on its review of the evidence of record at this stage of the litigation, the Court is not persuaded that Plaintiffs have met their burden on this Motion to show that CDISE's quotes, statements of work, organization chart, bonus programs, offer letters and employment terms, and "the manner by which [CDISE] prices out potential jobs and gathers information from its customers and potential customers," are protectable trade secrets under North Carolina law.

72.    First, Plaintiffs have failed to bring forward persuasive evidence of any kind to support their contention that CDISE's organization chart, bonus programs, and offer letters and employment terms constitute protectable trade secrets under

the law of this State. Indeed, not only have Plaintiffs failed to show that these items were subject to reasonable efforts to guard their secrecy, Plaintiffs have not offered any evidence that any CDISE employee ever acknowledged, or was even asked to acknowledge, that such information is confidential and should be maintained as confidential. *See, e.g., Artistic Southern Inc. v. Lund*, 2015 NCBC LEXIS 113, at *35 (N.C. Super. Ct. Dec. 9, 2015) ("the reasonableness of a plaintiff's efforts to maintain secrecy are 'necessarily fact dependent' and . . . a trial court must 'closely examine the circumstances surrounding the trade secret'"); *see generally Raybourne & Dean Consulting, Ltd. v. Metrica, Inc.*, No. SA-14-CA-918-OLG, 2016 U.S. Dist. LEXIS 181576, at *57–58 (W.D. Tex. Feb. 19, 2016) (organization chart not trade secret where no efforts to maintain secrecy).

73. Next, although Plaintiffs have offered evidence that CDISE's quotes and statements of work frequently carried a confidential designation when they were transmitted to CDISE's customers, the evidence of record shows that CDISE did not require its customers to maintain the confidentiality of this information and only asked its employees to maintain the confidentiality of this information as a result of a single customer's specific request. Moreover, the evidence before the Court shows that CDISE's customers in fact shared CDISE's quotes and statements of work with CDISE's competitors. Under the circumstances present here, the Court cannot conclude that CDISE's quotes and statements of work were subject to sufficient efforts to maintain their secrecy to qualify as trade secrets under North Carolina law. *See, e.g., Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1302 n.23 (E.D.N.C. 1996) (applying North Carolina law and concluding that "[s]tamping a

document 'confidential' does not make the information contained therein so. It is the status of the information, not that of the document which bears it, that will determine the existence of a trade secret. Documents do not contain trade secrets merely because they are confidential.") (citations and quotations omitted); *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *27 (N.C. Super. Ct. Apr. 23, 2015) ("Where a plaintiff does not restrict a customer's further distribution of pricing information provided to the customer and acknowledges the customer's right to use that information, the pricing is not entitled to trade secret protection."); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished.").

74. Last, our courts have made clear that "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003) (citations omitted) (injunctive relief properly denied where only general areas of research were identified as trade secrets and an absolute bar to activity in those areas was sought). The Court concludes that Plaintiffs' asserted trade secret – "the manner by which [CDISE] prices out potential jobs and gathers information from its customers and potential customers" – is not identified with sufficient particularity to meet this standard. *See, e.g., VisionAIR, Inc. v. James*, 167 N.C. App. 504, 511, 606 S.E.2d 359, 364

(2004) (preliminary injunction denied where trade secrets comprised "only broad product and technology categories"); *FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995) (applying North Carolina law and denying preliminary injunction where trade secret described only in general terms and where evidence of blatant misappropriation not shown).

75.    In contrast, the Court is persuaded that Plaintiffs have carried their burden on this Motion to show that CDISE's financial information and contact lists constitute protectable trade secrets under North Carolina law ("CDISE's Trade Secret Information") in the circumstances presented here.  Not only have our courts regularly concluded that such information may constitute trade secrets, but Plaintiffs have established that the information is valuable, both to Plaintiffs and their competitors, not generally known outside CDISE, difficult to duplicate or acquire, developed at significant cost to Plaintiffs, and subject to adequate measures to guard its secrecy, including limiting internal distribution and maintaining the information in password-protected computers and locked file cabinets in CDISE's office.  *See Wilmington Star-News, Inc.*, 125 N.C. App. at 180–81, 480 S.E.2d at 56; *see also, e.g.*, *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 174 N.C. App. 49, 53–56, 620 S.E.2d 222, 226–28 (2005) (finding compilation of business information to constitute trade secret); *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 174, 423 S.E.2d 324, 327 (1992) (holding customer lists and pricing and bidding formulas to constitute trade secrets).

76.    The Court is further persuaded that Plaintiffs have met their burden to show a likelihood of success on their contention that that Defendants have

misappropriated CDISE's Trade Secret Information and acquired, used, and disclosed CDISE's Trade Secret Information without Plaintiffs' consent.

77. The Court concludes that Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendants' acquisition, disclosure, and use of CDISE's Trade Secret Information and that Plaintiffs will suffer irreparable harm if Defendants and all other persons in active concert or participation with any Defendant are not preliminarily enjoined from continuing to engage in such unlawful conduct.

78. The harm to Plaintiffs is immediate and ongoing and cannot be later redressed by the Court if allowed to continue during the course of the litigation. Thus, the Court concludes, in the exercise of its discretion, that the issuance of a preliminary injunction is necessary for the protection of Plaintiffs' rights during the course of this litigation.

79. The Court has engaged in a balancing process, weighing potential harm to Plaintiffs if an injunction is not issued against the potential harm to Defendants if injunctive relief is granted, and finds that the potential harm to Plaintiffs outweighs that to Defendants.

80. Accordingly, the Court concludes, in the exercise of its discretion, that Plaintiffs are entitled to a preliminary injunction restraining and enjoining Defendants and all other persons in active concert or participation with any Defendant from retaining, using, disclosing, or distributing CDISE's Trade Secret Information.

B. Breach of Operating Agreement

81. A breach of contract requires the existence of a valid existing contract and a breach of the terms of that contract. *J.T. Russell & Sons, Inc. v. Silver Birch Pond LLC*, 217 N.C. App. 290, 295, 721 S.E.2d 699, 703 (2011) (citing *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 369, 618 S.E.2d 867, 870 (2005)).

82. The Operating Agreement is a valid and binding contract, and the Confidentiality Provision appearing therein binds Brown, as a member of CDISE. *See* N.C. Gen. Stat. § 57D-2-30(e); *N.C. State Bar v. Merrell,* No. COA14-1334, 777 S.E.2d 103, 114 (N.C. App. Oct. 6, 2015) ("An operating agreement is a contract"); *Richardson v. Kellar*, 2016 NCBC LEXIS 62, at \*12 (N.C. Super. Ct. Aug. 2, 2016).

83. Based on the Court's findings of fact on the current record, the Court concludes that Plaintiffs have established a likelihood of success on the merits on its claim against Brown for breach of the Operating Agreement by presenting persuasive evidence that the Operating Agreement constitutes a valid and binding contract between Brown and CDI and that Brown has engaged in conduct in breach of the Operating Agreement by disclosing CDISE's Protected Information to persons and entities outside CDISE.

84. In addition, the Court has found that after Brown resigned as CDISE's President, Defendants retained possession of CDISE's Protected Information and used that Protected Information in an effort to obtain a competitive advantage over CDISE with resulting harm to CDISE's business.

85. The Court concludes that Plaintiffs have suffered and continue to suffer irreparable harm as a result of Brown's disclosure and use of CDISE's Protected

Information and that Plaintiffs will suffer irreparable harm if Brown and all other persons in active concert or participation with him, including his co-Defendants, are not preliminarily enjoined from continuing to engage in such unlawful conduct.

86.    The harm to Plaintiffs is immediate and ongoing and cannot be later redressed by the Court if allowed to continue during the course of the litigation. Thus, the Court concludes, in the exercise of its discretion, that the issuance of a preliminary injunction is necessary for the protection of Plaintiffs' rights during the course of this litigation. *See ABT, Inc. v. Juszczyk*, No. 5:09CV119-RLV, 2010 U.S. Dist. LEXIS 91613, at *9, 25 (W.D.N.C. Aug. 10, 2010) (granting preliminary injunction for claims, including a claim of breach of contract for violating a confidentiality agreement, where plaintiff's goodwill and customer relationships would be injured).

87.    The Court has engaged in a balancing process, weighing potential harm to Plaintiffs if an injunction is not issued against the potential harm to Brown and the other Defendants if injunctive relief is granted, and finds that the potential harm to Plaintiffs outweighs that to Defendants.

88.    Accordingly, the Court concludes, in the exercise of its discretion, that Plaintiffs are entitled to a preliminary injunction restraining and enjoining Defendants and all other persons in active concert or participation with any Defendant from retaining, using, disclosing, or distributing CDISE's Protected Information.

C. Breach of Jacoby's Confidentiality Agreement

89. The Court has found that Jacoby signed CDISE's Confidentiality Agreement on October 27, 2015, four years after the commencement of his employment. The Court has also found that Jacoby did not receive anything in exchange for entering into the Confidentiality Agreement other than continued at-will employment with CDISE. Further, no party has contended that the Confidentiality Agreement functions as a restraint of trade, and the Court cannot conclude, based on the record before the Court, that the Confidentiality Agreement constitutes a restraint of trade.

90. Based on these findings of fact on the current record, the Court concludes that Plaintiffs have failed to show a likelihood of success in establishing that the Confidentiality Agreement is a valid and binding contract between Jacoby and CDISE. *See, e.g., RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, *115—25 (N.C. Super. Ct. Feb. 18, 2016) (applying *Kadis v. Britt*, 224 N.C. 154, 161–63, 29 S.E.2d 543, 547-49 (1944) and holding that "mere continued at-will employment" cannot constitute consideration for a modification of an employment contract under North Carolina law).[3]

---

[3] The Court recognizes that it previously concluded, on the particular facts of the case before it, that "a confidentiality agreement need not be supported by additional consideration if the agreement does not constitute a restraint of trade." *See Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at *14 (N.C. Super. Ct. Oct. 15, 2015) (citing *Sirona Dental, Inc. v. Smithson*, No. 3:14-cv-714-RJC-DSC, 2015 U.S. Dist. LEXIS 6080, at *6 (W.D.N.C. Jan. 20, 2015) (holding that where a non-disclosure "does not restrain trade, but rather seeks to prevent disclosure or use of confidential information; . . . new and additional consideration is not required" under North Carolina law).) To the extent the *Amerigas* and *Roundpoint* decisions are in conflict, the Court concludes that *Roundpoint* is the better-reasoned under controlling principles of North Carolina law.

D. Unfair and Deceptive Trade Practices

91. To establish a violation of N.C. Gen. Stat. § 75-1.1, a plaintiff must show: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to plaintiff." *E.g.*, *Dalton v. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001); *Becker v. Graber Builders, Inc.,* 149 N.C. App. 787, 794, 561 S.E.2d 905, 910 (2002).

92. "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Johnson v. Phoenix Mut. Ins. Co.,* 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980).

93. A defamatory statement tending to impeach one in that trade or profession affects commerce and may constitute an unfair and deceptive trade practice. *Ellis v. Northern Star Co.,* 326 N.C. 219, 225–26, 388 S.E.2d 127, 131 (1990); *Boyce & Isley v. Cooper*, 153 N.C. App. 25, 35–37, 568 S.E.2d 893, 901–02 (2002); *Ausley v. Bishop*, 133 N.C. App. 210, 216, 515 S.E.2d 72, 77 (1999).

94. Injunctive relief is available to plaintiffs who bring private suits under N.C. Gen. Stat. § 75-1.1. *See generally* Noel L. Allen, *North Carolina Unfair Business Practice* § 12.01 (3d ed. 2015). *See also, e.g., Johnson v. Honeycutt*, No. COA05-295, 2006 N.C. App. LEXIS 249, at *4 (N.C. Ct. App. Feb. 7, 2006) (affirming trial court judgment where trial court issued a preliminary injunction based on unfair and deceptive trade practices claim); *Union Carbide Corp. v. Sunox, Inc.,* 590 F. Supp. 224, 227–28 (W.D.N.C. 1984) (applying preliminary injunction standard to claim brought under N.C. Gen. Stat. § 75-1.1).

95. The Court concludes that, based on the Court's findings of fact, Plaintiffs have shown a likelihood of success on the merits on their claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 by presenting persuasive evidence of Defendants' misappropriation of CDISE's Trade Secret Information as well as persuasive evidence of Defendants' agents' false statements concerning Rove's status as a successor to, or a continuation of, CDISE in an effort to advantage Defendants in their trade and business at Plaintiffs' expense with intended and resulting harm to Plaintiffs.

96. The Court further concludes that such conduct has resulted in irreparable harm to Plaintiffs, and if not enjoined, will continue to result in irreparable harm to Plaintiffs because there is no adequate remedy at law, there is substantial difficulty and uncertainty in determining the amount of damages to be awarded for Defendants' conduct, and the injury Defendants have inflicted, and unless enjoined will continue to inflict, on Plaintiffs is one to which Plaintiffs should not be required to submit or Defendants permitted to inflict based on the record before the Court.

97. The Court has engaged in a balancing process, weighing potential harm to Plaintiffs if an injunction is not issued against the potential harm to Defendants if injunctive relief is granted, and finds that the potential harm to Plaintiffs outweighs that to Defendants.

98. The Court further concludes, in the exercise of its discretion, that the issuance of a preliminary injunction is necessary for the protection of Plaintiffs' rights during the course of this litigation.

99. Accordingly, the Court concludes, in the exercise of its discretion, that Plaintiffs are entitled to a preliminary injunction restraining and enjoining Defendants and all other persons in active concert or participation with any Defendant from retaining, using, disclosing, or distributing CDISE's Protected and Trade Secret Information and from making any misrepresentations to any person or entity, including CDISE's existing or potential customers, concerning Rove's status as a successor to, or a continuation of, CDISE.

E. Additional Requested Injunctive Relief

100. In addition to seeking a preliminary injunction enjoining Defendants from retaining, using, disclosing, or distributing any of CDISE's Protected and Trade Secret Information, and from misrepresenting to any person or entity that Rove is a successor to or a continuation of CDISE, Plaintiffs seek to enjoin Defendants from soliciting or performing any services for at least 24 but as many as 123 specifically identified, current and potential customers of Plaintiffs.

101. The Court concludes, however, that an injunction preventing Defendants from soliciting or performing services for Plaintiffs' existing and potential customers is not justified based on the current record before the Court. It is undisputed that Plaintiffs did not obtain a non-solicitation or non-competition agreement from Brown, Jacoby, or any of the employees who left CDISE to join Rove, and the Court concludes that under the circumstances here, Plaintiffs' requested relief seeks to provide Plaintiffs the benefit of a bargain they did not make without adequate basis or justification.

102. In addition, having concluded that Plaintiffs have an adequate remedy at law on their claims for failure to negotiate in good faith, breach of the covenant of good faith and fair dealing, conversion, breach of fiduciary duty, tortious interference with contract, and tortious interference with prospective economic relations, and having further concluded that Plaintiffs have not shown a likelihood of success on their breach of contract claim against Jacoby, the Court further concludes that the injunctive relief the Court enters in this Order based on Plaintiffs' claims for Brown's alleged breach of the Operating Agreement, Defendants' alleged misappropriation of trade secrets, and Defendants' alleged unfair trade practices will adequately address the irreparable harm the Court has found to exist and is likewise adequate to protect Plaintiffs' rights during the course of this litigation.

103. Therefore, having weighed the potential harm to Plaintiffs if this specific injunctive relief is not issued against the potential harm to Defendants if this specific injunctive relief is granted, and having found that the potential harm to Defendants outweighs that to Plaintiffs, the Court therefore, in the exercise of its discretion, declines to enter an injunction prohibiting Defendants from soliciting or performing services for Plaintiffs' existing or potential customers in this Order, without prejudice, however, to Plaintiffs' right to move the Court to amend this Order to seek such relief for good cause shown should circumstances warrant as this case moves through discovery.

104. Plaintiffs also seek an order requiring Defendants to immediately perform a complete inspection of their records and electronic systems for any documents

prepared prior to June 16, 2016 "that relate to CDISE's business in any way," and of their premises for any additional equipment and personal property of CDISE.

105. The Court concludes, in the exercise of its discretion and after weighing the potential harms to Plaintiffs and Defendants of this requested relief, that Defendants should be required to return to Plaintiffs any equipment, documents, or other property of CDISE in Defendants' possession or under Defendants' control, provided, however, that Defendants should not be required to return to Plaintiffs any documents or other property Defendant Brown received solely in his capacity as a member of CDISE.

IV.

CONCLUSION

106. WHEREFORE, based upon the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it is hereby ORDERED, in the exercise of the Court's discretion, that pending final resolution of this civil action, and unless and until otherwise ordered by this Court:

    a. Brown, and any persons or entities in active concert or participation with him, is hereby RESTRAINED and ENJOINED, during the pendency of this action, from using, disclosing, or distributing CDISE's Protected Information (as defined herein), including without limitation any quotes and scopes of work prepared prior to June 21, 2016 on CDISE or Rove letterhead; communications with CDISE's customers and potential customers prior to June 21, 2016; CDISE's forms, templates, and other business documents; CDISE's sales records, forecasts, and financial

information; and any CDISE document, in physical or electronic form, marked with a confidential designation; provided, however, that Brown may (i) disclose CDISE's Protected Information to carry out the business of CDISE, and (ii) disclose CDISE's Protected Information to obtain advice from accountants, tax advisors and legal counsel in his capacity as a member of CDISE;

b. Defendants, and any persons or entities in active concert or participation with any of them, are hereby RESTRAINED and ENJOINED, during the pendency of this action, from using, disclosing, or distributing CDISE's Trade Secret Information (as defined herein);

c. Defendants, and any persons or entities in active concert or participation with any of them, are hereby RESTRAINED and ENJOINED, during the pendency of this action, from making any misrepresentation to any person or entity, including to CDISE's existing or potential customers, asserting that Rove is a successor entity to, a continuation of, or the same entity as, CDISE;

d. Defendants are hereby ORDERED to return to Plaintiffs any equipment, documents, or other property of CDISE in Defendants' possession or under Defendants' control, including without limitation any quotes and scopes of work prepared prior to June 21, 2016 on CDISE or Rove letterhead; communications with CDISE's customers and potential customers prior to June 21, 2016; CDISE's forms, templates, and other business documents; CDISE's sales records, forecasts, and financial

information; and any CDISE document, in physical or electronic form, marked with a confidential designation; provided, however, that Defendants shall not be required to return to Plaintiffs any documents or other property Defendant Brown received solely in his capacity as a member of CDISE. Defendants are further ordered to file a statement with the Court within sixty (60) days of the entry of this Order certifying that Defendants have fully complied with this paragraph and identifying any documents not returned to Plaintiffs based on an assertion that Brown received such documents solely in his capacity as a member of CDISE.

e. Pursuant to N.C. Gen. Stat. § 1A-1, Rule 65(c), this Order shall become effective upon Plaintiffs' posting of security in the amount of Five Thousand Dollars ($5,000.00) ("Security"), which the Court concludes, in the exercise of its discretion, is reasonable and appropriate as a condition of granting this preliminary injunction. The Security shall be in the form of cash, check, surety bond, or other undertaking satisfactory to the Clerk of Superior Court of Mecklenburg County. The Court's order concerning Plaintiffs' posting of security is without prejudice to any party's right to move the Court to adjust the amount of the Security for good cause shown.

f. Except as GRANTED by the terms of this Order, the Motion is DENIED.

**SO ORDERED**, this the 27th day of January, 2017.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
  for Complex Business Cases